IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 1, 2017

## IN RE BILLY T.W., ET AL.

**Appeal from the Juvenile Court for Loudon County**
**No. 16-JV-59      Henry E. Sledge, Judge**

_____

### No. E2016-02298-COA-R3-PT

_____

In this parental termination action, we conclude that the trial court properly found clear and convincing evidence to terminate the rights of the mother and father on the grounds of failure to provide a suitable home, substantial noncompliance with a permanency plan, and persistence of conditions. We conclude that the trial court erred in terminating the father's rights on the ground of willful failure to visit. Clear and convincing evidence supports the trial court's determination that termination of parental rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and KENNY W. ARMSTRONG, JJ., joined.

Christine L. Dummer, Knoxville, Tennessee, for minor children Billy T.W. and Emily G.W.

Ian P. McCabe, Knoxville, Tennessee, for the appellant, Billy T.W.

Christopher Irvin Belford, Knoxville, Tennessee, for the appellant, Christy A.W.

Herbert H. Slatery, III, Attorney General and Reporter, and William Derek Green, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

# OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

Christy A.W. ("Mother") and Billy T.W. ("Father") are the parents of a son, Billy, and a daughter, Emily, born in February 2003 and December 2005, respectively. The Department of Children's Services ("DCS" or "the Department") filed a Petition for Order Controlling Conduct and for Protective Supervision against Mother and Father in January 2015 asking the court to find the children dependent and neglected, "to require protective supervision, and to control the conduct of the parents." The petition alleged that the family had "extensive DCS history and the parents have criminal history for drugs, assault, and theft." After receiving a report that Mother was selling her food stamps to buy pain pills, that Emily was begging neighbors for food, that Billy's feeding tube was "unkempt," and that "the home was cluttered with food, trash and other items," DCS case manager Brittni Monroe visited the home on September 30, 2014. Mother "tested positive for opiates, oxycodone, and benzodiazepines." She refused a request for a pill count. Mother submitted to a drug screen on October 29, 2014 and tested positive for oxycodone; she refused to allow a pill count or to sign a release to permit the case manager to obtain information from her pharmacy.

On January 27, 2015, the juvenile court held an adjudicatory hearing regarding Father, who had notice of the hearing but failed to appear. The court determined that Father had been uncooperative with the investigation and that the children were dependent and neglected. The court ordered Father to complete an alcohol and drug assessment, "submit and pass random drug screens and pill counts, sign releases for DCS and GAL [guardian ad litem] to obtain service provider and pharmaceutical and medical records, cooperate with DCS and service provider and GAL, obtain and maintain stable housing, transportation and income."

At a hearing on April 17, 2015, the juvenile court awarded temporary custody of the minor children to DCS. The court found that the Department had "attempted a less drastic measure than removal by first filing a petition to control conduct and by placing services in the home." The court's order (entered on April 20, 2015) includes the following findings concerning the Department's efforts after the initial order in January 2015 finding the children dependent and neglected:

> DCS caseworker, Jennie Barger, attempted to contact [Father] on April 4, 2015 and have him come to her office for a random drug screen. Ms. Barger was unable to locate [Father]. On April 17, 2015, Ms. Barger made an unannounced, unscheduled visit to the home of [Father and Mother]. [Father] was unavailable and [Mother] was unable to contact him. Ms. Barger also noted that [Mother] appeared to be under the influence. . . . After leaving the home, Ms. Barger made contact with [the children] at

- 2 -

school.  Billy has a feeding tube.  Ms. Barger testified Billy appeared tired, dirty and not well cared for.

The parents were allowed supervised visitation with Billy and Emily.  Father was ordered to pay child support in the amount of $100 per month.

On May 4, 2015, DCS filed a petition in response to a bench order summarizing the caseworker's allegations concerning the case, requesting that the court consider the need to appoint counsel for the parents, find the children dependent and neglected at a final hearing, and consider the ability of the parents to pay child support.  At a hearing on July 13, 2015, both parents waived the adjudicatory hearing and stipulated that the children were dependent and neglected by Mother for improper care and supervision pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(C) and by Father for abuse and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(G).[1]  The court went on to conduct a permanency hearing and found both parents to be in partial compliance with their permanency plan.  (The requirements of the permanency plan will be discussed in the analysis section of the opinion.)  The goals of the permanency plan were return to parent and exit custody with relative.  The court ratified the permanency plan.

The Department filed the petition to terminate parental rights on February 4, 2016.  The petition alleges five grounds for termination:  (1) abandonment by failure to visit in the four months preceding the filing of the petition (Father only), (2) abandonment by failure to provide a suitable home, (3) substantial noncompliance with the permanency plan, (4) persistent conditions, and (5) abandonment by wanton disregard (Mother only).  The juvenile court heard the case on October 7, 2016, and the only witness to testify was Eric Fannin, a DCS representative.  The trial court determined that there was clear and convincing evidence to support four of the five grounds alleged:  abandonment by failure to visit (Father), abandonment by failure to provide a suitable home (both parents), substantial noncompliance (both parents), and persistent conditions (both parents).  The court did not find clear and convincing evidence to support the ground of wanton disregard.[2]  Furthermore, the court concluded that it was in the children's best interest for the parents' rights to be terminated.  Therefore, the court ordered the termination of Mother's and Father's parental rights.

---

[1] These statutory citations are to the version of Tenn. Code Ann. § 37-1-102(b)(12) in effect at the time of the hearing in May 2015.

[2] Pursuant to the holding of our Supreme Court in *In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016), we must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal."  We do not interpret *In re Carrington H.* to require us to "review those grounds for termination that the trial court found were not supported by clear and convincing evidence," unless DCS raises an issue on appeal concerning the trial court's ruling that the Department failed to prove one of these grounds. *In re P.T.F.*, No. E2016-01077-COA-R3-PT, 2017 WL 2536847, at *8 (Tenn. Ct. App. June 12, 2017).  Therefore, we will not discuss the ground of wanton disregard.

Both parents have appealed and challenge all of the grounds for termination found by the trial court as well as the best interest determination.

STANDARD OF REVIEW

Under both the federal and state constitutions, a parent has a fundamental right to the care, custody, and control of his or her own child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). This right is not absolute, however. If a compelling state interest exists, the state may interfere with parental rights. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn. 1994)). Our legislature has enumerated the grounds upon which termination proceedings may be brought. *See* Tenn. Code Ann. § 36-1-113(g). A parent's rights may be terminated only where a statutory ground exists. *In re Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Because terminating a parent's fundamental parental rights has severe consequences, termination cases require a court to apply a higher standard of proof. *State Dep't of Children's Servs. v. A.M.H.*, 198 S.W.3d 757, 761 (Tenn. Ct. App. 2006). First, a court must determine by clear and convincing evidence that at least one of the statutory grounds for termination exists. Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). After a court makes this determination, a court must find by clear and convincing evidence that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Valentine*, 79 S.W.3d at 546. "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014) (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted)).

Because of the heightened standard of proof required in termination cases, we must adapt the customary standard of review established by Tenn. R. App. P. 13(d). *Id.* In accordance with Tenn. R. App. P. 13(d), we review the trial court's findings of fact de novo with a presumption of correctness unless the evidence preponderates otherwise. Id. Next, we must determine whether the facts establish by clear and convincing evidence the elements necessary to terminate parental rights. *In re M.J.B.*, 140 S.W.3d at 654.

ANALYSIS

1.  Abandonment by failure to visit–Father

A parent's rights may be terminated upon proof by clear and convincing evidence that the parent "abandoned" his or her child. Tenn. Code Ann. §§ 36-1-113(c)(1), (g)(1).

- 4 -

There are a number of different statutory definitions of abandonment. *See* Tenn. Code Ann. § 36-1-102(1)(A). Tennessee Code Annotated section 36-1-102(1)(A)(i) defines abandonment as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

A court must find that the abandonment was "willful." Tenn. Code Ann. § 36-1-102(1)(A)(i). The statutory definition of "willfully failed to visit" is "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). Tennessee Code Annotated section 36-1-102(1)(C) defines "token visitation" as "perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child."

To establish willfulness in this context, a petitioner must show that "a parent who failed to visit or support had the capacity to do so, made no attempt to do so, and had no justifiable excuse for not doing so." *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013); *see also In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (stating that a person acts willfully if he or she knows what he or she is doing and has the intention to do what he or she is doing). "Whether a parent failed to visit or support a child is a question of fact. Whether a parent's failure to visit or support constitutes willful abandonment, however, is a question of law." *In re Adoption of Angela E.*, 402 S.W.3d at 640 (citing *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007)). A parent will not be found to have abandoned his or her child if the failure to visit the child is not within his or her control. *Id.*

The four months prior to the filing of the petition to terminate Father's parental rights in this case are from October 4, 2015 to February 3, 2016. The trial court found that Father "willfully did not visit [the children]" during this time period. The trial court specifically found that Father was not incarcerated during the relevant time period, that he knew that the children were in DCS custody, that DCS contacted Father to arrange visits, and that Father "knew the consequences of [his] failure to visit the child[ren] regularly because DCS and the Court told him . . . ." Mr. Fannin testified that Father decided to move to Louisiana for employment and that Mr. Fannin explained that DCS could not facilitate visitation outside of Tennessee.

It is undisputed that Father failed to visit the children during the four months prior to the filing of the petition. Father's argument is that the trial court's finding of abandonment is erroneous in light of Father's "reasonable efforts" toward reunification. Tennessee Code Annotated section 36-1-102(1)(A)(i) does not include a "reasonable efforts" analysis. We will, however, consider the facts cited by Father in considering the issue at hand—whether Father's failure to visit as a result of his relocation to Louisiana for employment was willful.

The burden of proof is upon DCS to prove willfulness by clear and convincing evidence. *See In re Lynx C.*, No. E2016-01568-COA-R3-PT, 2016 WL 7378801, at *5 (Tenn. Ct. App. Dec. 20, 2016). Did Father's decision to move to Louisiana for employment constitute a justifiable excuse for failing to visit his children? [3] *See In re Audrey S.*, 182 S.W.3d at 864 ("Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so."). In evaluating willfulness, courts may consider events that occurred prior to the relevant four-month period because such events "may bear on the willfulness of the parent's conduct during the four-month period." *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *12 (Tenn. Ct. App. May 29, 2015).

We find two cases to be particularly instructive regarding the case at hand. In *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *9 (Tenn. Ct. App. Mar. 2, 2009), the appellate court considered whether a mother's failure to visit her children during the four months prior to the filing of the petition to terminate her parental rights was willful. The petition to terminate was filed on May 11, 2007; thus, the relevant four-month period was from January 11, 2007 through May 10, 2007. *In re B.D.*, 2009 WL 528922, at *1. During this four-month period, the mother visited the children on January 2, January 27, and February 9, 2007. *Id.* at *9. She moved to Illinois in late February 2007 "to be near family support." *Id.* In concluding that the mother's "less than perfect visitation record is not proof of abandonment by clear and convincing evidence," *Id.* at *10, the trial court made the following statements:

> A review of the record shows that Mother's visits, while less than perfectly regular, do show that she made efforts to maintain a relationship with her children and have meaningful visits with them. Even when unable to visit, Mother's actions fall short of "willful" abandonment.

---

[3] Mr. Fannin testified that Father never produced evidence of income from employment in Louisiana. DCS must prove by clear and convincing evidence, however, that Father's failure to visit was willful, so the Department must show that Father's move to Louisiana, which Father asserted was for employment, did not constitute a justifiable excuse for his failure to visit.

Mother visited the children on January 2, 2007, January 27, 2007, and February 9, 2007. The foster mother testified that Mother also visited with the girls in late February or early March 2007. Mother moved to be near family support in Illinois in late February 2007, which made visitations difficult. Nonetheless, despite transportation and financial issues, Mother visited with the minor children on July 27, 2007, March 25, 2008 and March 26, 2008. Mother scheduled a visitation for the weekend of April 12, 2008, but the foster parents failed to deliver the girls for visitation.

Mother made these 2007 visits without assistance to and from Illinois. Even though the caseworker knew that Mother did not have transportation and could not financially afford to travel to Tennessee, the state only began to offer transportation and lodging to Mother after the petition for termination was filed. Once help was offered, Mother's visitations resumed. Furthermore, as the case manager testified, Mother stayed in regular contact with the children by telephone and letters, as was identified in the visitation section of the permanency plan.

*Id.* at *9.

The more recent case of *In re Caira D.*, No. M2014-01229-COA-R3-PT, 2014 WL 6680696 (Tenn. Ct. App. Nov. 25, 2014), is factually similar to the present case. In *In re Caira D.*, it was undisputed that the father had not visited his children during the four months prior to the filing of the petition, and the issue was whether his failure to visit was willful. *In re Caira D.*, 2014 WL 6680696, at *6. The family had lived in Indiana, but the mother moved with the children to Tennessee while the father remained in Indiana after the parents separated. *Id.* at *1. Father asserted that he was not able to make the seven-hour trip from Indiana to Tennessee because he did not have a driver's license and could not afford the cost of traveling. *Id.* at *7. Father further argued that he "visited" with his children by talking with them over the telephone at least every other week. *Id.* The DCS caseworker who supervised these telephone calls testified that the father "called his children at least once every other week during the four-month period, and that each phone call lasted approximately twenty minutes." *Id.* The trial court found that the phone calls amounted to only token visitation. *Id.*

The appellate court disagreed, finding that "the evidence fails to establish by clear and convincing evidence that [the father's] telephone visits constituted mere token visitation." *Id.* The court emphasized that "token visitation" is defined as "'visitation, *under the circumstances of the individual case*, [which] constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child.'" *Id.* (quoting Tenn. Code Ann. § 36-1-102(1)(C)). The court stated:

[I]t is undisputed that Father visited by phone with his children every other week during the relevant four-month period for approximately twenty minutes. Thus, considering the circumstances of this case, including Father's modest financial means, lack of a driver's license, the fact that it would be a seven-hour one-way trip to visit his children, and the lack of evidence that anyone was willing to provide transportation assistance or drive him to Cookeville for visitation, we are unable to conclude that twenty-minute phone calls with his children every other week during the relevant four-month period constitutes token visits. *See In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *9 (Tenn. Ct. App. Mar. 2, 2009) (stating that although the mother only visited the children three or four times during the relevant four-month period, the court found that her distance from the children made visitations difficult and that the mother maintained regular contact with the children by telephone and letters, circumstances which did not support a finding that the mother abandoned her children by willfully failing to visit them). Thus, even though Father did not visit with the children in person during the relevant four-month period, we find the evidence fails to establish by clear and convincing evidence that his telephone visits constituted mere token visitation.

*Id.* (footnote omitted). The court in *In re Caira D.* concluded that "the evidence in this record has not completely eliminated all 'serious or substantial doubt' about the correctness of the conclusion that Father's failure to visit with the children in person was willful." *Id.* (quoting *In re Valentine*, 79 S.W.3d at 546).

The reasoning of *In re B.D.* and *In re Caira D.* leads us to the conclusion that the trial court erred in finding clear and convincing evidence that Father's failure to visit was willful. Mr. Fannin testified that, during the relevant four-month time period, when Father lived in Louisiana, he talked with the children on the telephone "about once a week." Mr. Fannin told Father that the Department could not facilitate visits outside of Tennessee. Before he moved to Louisiana, Father visited the children on April 24, 2015, July 31, 2015, August 14, 2015, August 20, 2015, August 28, 2015, September 10, 2015, and September 24, 2015. Mr. Fannin also listed dates of visits that occurred after the relevant four-month time period: April 5, 2016, April 7, 2016, April 15, 2016, and May 10, 2016. He stated that each of these visits lasted two hours. According to Mr. Fannin, Father never behaved inappropriately at the visits or appeared to be impaired. As in *In re Caira D.*, under the circumstances of this case, including Father's distance from the children and the Department's failure to offer assistance with visits when Father was in Louisiana, we cannot conclude that weekly phone calls with the children constituted merely token visits. *See In re Caira D.*, 2014 WL 6680696, at *7. We hold that the Department failed to prove by clear and convincing evidence that Father's failure to visit the children in person was willful.

2. <u>Abandonment by failure to provide a suitable home</u>

With respect to this ground, Mother argues that the Department failed to make reasonable efforts to assist her. Father asserts that the trial court erred in terminating his rights based on this ground because he and Mother secured a home for a period of time.

Abandonment by failure to provide a suitable home occurs under the following circumstances:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii). Thus, the statute requires the Department to prove, with respect to the relevant four-month time period, three elements: (1) the parent has failed to make reasonable efforts to provide a suitable home, (2) DCS has "made reasonable efforts to assist the parent . . . to establish a suitable home,"[4] and (3) the parent has "demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." Tenn.

---

[4] In *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015), our Supreme Court overruled case law requiring DCS to prove reasonable efforts to reunify the family as a precondition to terminating parental rights. The Court noted, however, that "proof of reasonable efforts is required to prove the ground of abandonment by failure to provide a suitable home." *Id.* at 555 n.32.

Code Ann. § 36-1-102(1)(A)(ii). In this case, the four-month time period following the children's removal runs from April 17 to August 17, 2015.

In the context of Tenn. Code Ann. § 36-1-102(1)(A)(ii), a "suitable home" means "'more than a proper physical living location.'" *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home must "be free of drugs and domestic violence." *Id.*

Mother argues that DCS failed to make reasonable efforts to assist her in establishing a suitable home, as required by Tenn. Code Ann. § 36-1-102(1)(A)(ii).[5] "Reasonable efforts" has been defined to mean "the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1); *see In re C.L.M.*, No. M2005-00696-COA-R3-PT, 2005 WL 2051285, at *9 (Tenn. Ct. App. Aug. 25, 2005) (applying Tenn. Code Ann. § 37-1-166(g)(1) definition to case involving abandonment by failure to provide suitable home). It should be noted that, "the Department does not bear the obligation to establish a suitable home alone, and parents must make their own efforts at reunification." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re C.L.M.*, 2005 WL 2051285, at *9) (noting that "reunification is a 'two-way street'")).

The children were removed from the home on April 17, 2015 due to the parents' drug abuse, improper care and supervision of the children, and noncompliance with services. The Department submitted an affidavit of reasonable efforts by Eric Fannin dated December 17, 2015 detailing the following services provided during the four months after the children's removal from the home:

- Alcohol and drug assessment with recommendations for in-home parenting classes, intensive outpatient rehab (IOP), and family counseling.
- In-home IOP for parents starting August 2015; also approved in-home parenting classes but parents refused services.
- Drug screen of Mother on 5/6/15 (positive for oxycodone, no proof of prescription). Drug screen of Mother on 6/23/15 (positive for BZO, OPI, and OXY, no proof of prescriptions). Drug screen of Mother on 7/1/15 negative. Attempted drug screen on 8/5/15 during random home visit, Mother unable to produce sample. Drug screen of Mother on 8/26/15 positive for oxycodone.

---

[5] Mother also argues, without any supporting authority, that the trial court erred in finding the ground of abandonment by failure to provide a suitable home because DCS restricted Mother's ability to provide for the children by "intercepting" the children's disability benefits. Without knowing any further facts, we assume that Mother is referring to benefits to which the children are entitled and which, therefore, are legally payable to the children's guardians.

Mother refused to sign information release. Drug screen of Father on 8/26/15 positive for oxycodone, no prescription.

- Parent-child visit scheduled for 5/15/15 had to be cancelled because parents were incarcerated. Visit scheduled for 6/10/15 was cancelled because Mother did not call to confirm 24 hours in advance.
- Attempted random home visit on 7/9/15, Mother not home.
- Parent-child visit with Mother on 7/15/15 prior to permanency hearing and with Father after the hearing.
- Attempted random drug screen with Mother during children's therapy visit on 7/22/15. Mother called and reported she would not be there due to illness. Case manager went to her home but she was not there, made multiple phone calls but Mother did not answer.
- Parent-child visit on 7/31/15 with both parents. Mother appeared to be under the influence.
- Attempted drug screen of Mother on 8/5/15 during random home visit, Mother unable to produce sample.
- Parent-child visit on 8/14/15.

The Department developed a permanency plan with the parents in early May 2015. By July 2015, the Department had provided the parents with $789.97 to pay overdue utility bills in order to help them obtain suitable housing.

In an affidavit of reasonable efforts dated March 24, 2016, Mr. Fannin testified that the Department had been providing in-home IOP to the Mother but the contractor was now refusing to work with Mother "due to non-compliance and police report was filed by the IOP worker due to [Mother] allegedly stealing her laptop." As of that date, Mother had not yet started inpatient treatment. Mother takes issue with the Department's decision to change its recommendation from in-home treatment to inpatient treatment in light of her limited resources. At the hearing, Mr. Fannin explained the Department's decision as follows:

> The original recommendation [from the alcohol and drug assessment] was for her to complete outpatient treatment. During that time frame she was arrested on drug charges and had failed several drug screens and failed pill counts. The recommendation was to change to inpatient treatment. She was also convicted on November the 18th on a drug-related charge and a theft-related charge and a reckless endangerment change and was court ordered to do inpatient treatment.

Under these circumstances, we cannot say that the Department's actions were unreasonable. Mother also mentions the problem of lack of transportation. We note,

however, that inpatient treatment presents much fewer transportation issues than most types of outpatient treatment.

The Department's efforts "to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal . . . ." Tenn. Code Ann. § 36-1-102(1)(A)(ii). During the four months following the children's removal, Mother continued to abuse drugs, as evidenced by her positive drug screens. At the end of the four months, Mother and Father were living in an unsanitary home belonging to the maternal grandmother, even though Mr. Fannin had informed them that this home was not suitable for the children. Both parents were arrested within a month of the children's removal. Mother was arrested in May 2015 for filing a false police report. In July 2015, she was charged with public intoxication and, in August 2015, she was charged with possession of a controlled substance and possession of drug paraphernalia. Father was arrested in May 2015 for failure to appear in court and contempt of court. In light of both parents' continuing problems with drug use and criminal activity as well as their failure to cooperate with the Department, we conclude that the Department exerted reasonable efforts to help Mother and Father obtain suitable housing.

Finally, the third prong of the suitable home analysis requires the Department to prove by clear and convincing evidence that the parent has "demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date." Tenn. Code Ann. § 36-1-102(1)(A)(ii). As to this portion of the analysis, the court "may consider the parents' more recent behavior." *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *7 (Tenn. Ct. App. Feb. 1, 2017) (citing *In re Joshua S.*, No. E2010-01331-COA-R3-PT, 2011 WL 2464720, at *18 (Tenn. Ct. App. June 16, 2011)). After removal, Mother was arrested a total of six times on charges including DUI, possession of illegal substances, theft, and criminal trespass. She had charges pending at the time of trial. Mother failed nine out of twelve drug screens. After being compliant for the first year of the case, Mother failed to respond to requests for drug screens during the summer of 2016, and she was not compliant with follow-up treatment and other recommendations (including Narcotics Anonymous) after inpatient care. Mr. Fannin testified that Mother had not had a pill count or drug screen since finishing inpatient treatment. Although the parents obtained their own housing for a period of about four months, neither maintained housing on a consistent basis. Mother lived in hotels, with her mother, or with friends and failed to respond to Mr. Fannin's requests for a home address.

When Father moved to Louisiana in the fall of 2015, he could no longer participate in in-home IOP. In addition to his arrest in May 2015, Father was arrested two more times and spent nearly five months in jail. He was incarcerated, out of the state, or homeless for nearly twelve of the eighteen months between removal and the trial. Father failed three of four random drug screens. Father argues that the trial court's

- 12 -

holding was in error in part because the parents obtained suitable housing for approximately four months. He asserts that the time period when the parents lost this house coincides roughly with the time period when Father did not have verified employment.

At the time of trial, Father emphasizes, the proof showed that he had been employed since September 2016. Therefore, he argues, "it was plausible at the time of trial" that Father and Mother would be able to provide the children with a suitable home at an early date. In determining whether grounds for termination have been established, however, we are required to "'look to the evidence of the parent's past actions, rather than the parent's future aspirations.'" *In re Derrick J.*, No. E2015-01507-COA-R3-PT, 2016 WL 3752013, at *8 (Tenn. Ct. App. July 8, 2016) (quoting *In re Adoption of Logan A.S.*, No. W2009-02661-COA-R3-PT, 2010 WL 3984712, at *8 (Tenn. Ct. App. Oct. 12, 2010)). As discussed above, "suitable home" means "'more than a proper physical living location.'" *In re Hannah H.*, 2014 WL 2587397, at *9. A suitable home must be free of drugs and "requires a safe and stable environment." *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017). At the time of trial, the parents had not yet resolved their housing instability, drug problems, or criminal issues.

There is clear and convincing evidence in the record that, from the time of the children's removal to the time of trial, Mother and Father exhibited such a lack of concern for the welfare of the children that it appeared unlikely that they would be able to provide them with a suitable home at an early date. We find clear and convincing evidence to support the trial court's determination that DCS met its burden to prove the ground of abandonment by failure to provide a suitable home as to both parents.

3. Substantial noncompliance

To establish the ground of substantial noncompliance with a permanency plan, the Department must prove by clear and convincing evidence that the parent has not substantially complied with the statement of responsibilities set forth in the permanency plan at issue. Tenn. Code Ann. § 36-1-113(g)(2). Substantial noncompliance "should be measured by both the degree of noncompliance and the weight assigned to that requirement." *In re Valentine*, 79 S.W.3d at 548. This court has described the proper analysis for a trial court to use in determining whether a parent has substantially complied with a permanency plan:

> Before analyzing whether the parent complied with the permanency plan, the trial court must find that the permanency plan requirements that the parent allegedly failed to satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (citing Tenn. Code Ann. § 37-2-403(a)(2)(C)).

- 13 -

If the permanency plan requirements are reasonable, the court must determine if the parent's noncompliance was substantial; noncompliance is not enough to terminate a parent's rights. *Id.* at 548-49. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "trivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *Id.* at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)).

*In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *11 (Tenn. Ct. App. Mar. 23, 2015). Whether a parent is substantially noncompliant with a permanency plan is a question of law. *In re Valentine*, 79 S.W.3d at 548.

The Department developed an initial permanency plan with Mother's participation in May 2015. Father agreed to the terms of the plan. The permanency plan required the parents to (1) complete an alcohol and drug assessment and follow all recommendations, (2) sign releases for all prescribing physicians and take medications as prescribed, (3) submit to random drug screens and pill counts and unscheduled home visits, (4) complete a mental health assessment and follow all recommendations, (5) maintain stable and legal income and provide proof to DCS, (6) obtain safe and stable housing and provide proof to DCS, (7) maintain regular contact with DCS and notify the case worker of any change of circumstance, (8) maintain safe and reliable transportation, (9) participate in scheduled visitation with the children, (10) complete parenting classes and submit proof to DCS, (11) refrain from accruing criminal charges, (12) make regular calls to case worker to check on well-being of the children, and (13) maintain regular telephone contact with the children. The juvenile court ratified the permanency plan and found the requirements to be reasonably related to remedying the conditions that necessitated foster care. Neither parent argues on appeal that the requirements of the permanency plan are not reasonably related to the conditions that required their children's removal.

Mother and Father argue that the trial court erred in finding noncompliance because they made partial progress toward the goals of the permanency plan.[6] Mother emphasizes that the primary reason for removal was drug treatment and rehabilitation and that she "made significantly more progress, or at least attempts at progress, as the case proceeded." We agree with Mother that drug use was a main reason for the children's removal, but we disagree that she substantially complied with the permanency plan or

---

[6] In her argument, Mother acknowledges the holding of *In re Kaliyah S.*, 455 S.W.3d at 555 (stating that reasonable efforts by DCS need not be proven to establish grounds for termination), but maintains that "[i]t appears incongruous to expect a parent to complete actions when efforts are not made to assist the parents in doing so."

- 14 -

made significant progress on the drug-related requirements. Mother completed one month of inpatient rehab in June 2016, one year after the permanency plan was developed, four months after the filing of the petition to terminate her parental rights, and at least partly as a condition of her probation. *See In re Malaya B.*, No. E2015-01880-COA-R3-PT, 2016 WL 3083045, at *2, 5 (Tenn. Ct. App. May 24, 2016) (finding mother substantially noncompliant where she made no effort to recover from addiction until three months after filing of termination petition). After inpatient treatment, Mother failed to comply with Mr. Fannin's requests for drug screens and did not participate in follow-up IOP or Narcotics Anonymous, as recommended. She also consistently failed pill counts, most recently in April 2016.

As stated above, the parents never maintained suitable housing. Moreover, neither maintained consistent visitation. Father attended only four visits during the year before trial. Mother had not visited the children in over three months at the time of trial. Mr. Fannin scheduled multiple visits between July and September 2016, but the parents failed to confirm or cancel, as required. As detailed above, both parents had multiple arrests. While Father claimed to have begun working in September 2016, he never provided DCS with proof of income. At the time of trial, both parents had unresolved criminal charges. The parents never completed parenting classes after being terminated for nonattendance. They also failed to follow the recommendations of their mental health and alcohol and drug assessments. Neither parent began individual counseling. Mother and Father reported that they started church-based family counseling in the fall of 2015, but they never provided DCS with any documentation. Neither parent completed the intensive outpatient program: Father, because he moved to Louisiana, and Mother, due to noncompliance and the alleged theft of a laptop.

While the parents have complied in part with some of the requirements of the permanency plan, we conclude that clear and convincing evidence supports the trial court's finding that the parents did not substantially comply with the permanency plan.

4. Persistence of conditions

Tennessee Code Annotated section 36-1-113(g)(3) authorizes termination of parental rights when:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

- 15 -

(B)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

As this court has previously stated, the goal of the ground of persistence of conditions "is to avoid having a child in foster care for a time longer than reasonable for the parent to demonstrate her ability to provide a safe and caring environment for the child." *In re Malaki E.*, 2015 WL 1384652, at *9 (citing *In re Arteria H.*, 326 S.W.3d 167, 178 (Tenn. Ct. App. 2010), *overruled on other grounds*, *In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)).  The persistence of conditions ground focuses "on the results of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874.  The court must determine "the likelihood that the child can be safely returned to the custody of the mother, not whether the child can safely remain in foster care . . . ." *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000).  "A parent's continued inability to provide fundamental care to a child, even if not willful, whether caused by a mental illness, mental impairment, or some other cause, constitutes a condition which prevents the safe return of the child to the parent's care." *In re Jamazin H.M.*, No. W2013-01986-COA-R3-PT, 2014 WL 2442548, at *6 (Tenn. Ct. App. May 28, 2014).

The children were removed from the parents' home in April 2015 and adjudicated dependent and neglected in January and July 2015.  Most of the dependency and neglect orders are fill-in-the-blank forms and do not specify the precise factual grounds for the children's removal.[7]  Based upon the April 20, 2015 bench order granting temporary custody to DCS, the reasons for removal were Father's failure to cooperate with the Department, Mother's continuing drug abuse, and the parents' failure to provide the children with proper care.  The Department filed its petition to terminate in February 2016.  The trial court made the following pertinent findings in its order granting termination:

DCS removed the children from [parents'] home because of the parents' drug abuse and environmental neglect.

---

[7] In the adjudicatory order, the court stated that the parents stipulated that the children were dependent and neglected by Mother for improper care and supervision pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(C) and by the Father for abuse and neglect pursuant to Tenn. Code Ann. § 37-1-102(b)(12)(G).

The conditions that led to the removal still persist: the parents are both still unstable, have unresolved drug issues, and are not visiting the children regularly, and have been engaged in criminal activity.

Mother does not dispute that the children were removed for dependency and neglect or that they have been removed for more than six months. She argues that proof of continuing substance abuse was not presented at trial, that instability was not an issue at the time of removal, and that her cooperation with services improved over time. In support of her argument regarding the lack of proof of continuing substance abuse, Mother cites *In re Jimmy B.*, E2015-02070-COA-R3-PT, 2016 WL 2859180 (Tenn. Ct. App. May 11, 2016). Because the father in *In re Jimmy B.* failed to cooperate with DCS, the Department was unable to present evidence at trial that he continued to use drugs at the time when the petition was filed. *In re Jimmy B.*, 2016 WL 2859180, at *7. The court held that DCS had failed to meet its burden of proving persistence of conditions. *Id.* at *8. In this case, Mother argues that DCS failed to prove that she was using drugs at or near the time of trial.[8] The Department argues that Mother's failure to comply with drug screens and attend follow-up alcohol and drug treatment "strongly suggests ongoing drug issues." This type of inference does not, however, constitute clear and convincing evidence to support the persistence of conditions ground. In *In re Jimmy B.*, the court noted that "Father's failure to show up consistently for visits, drug screens, and court hearings or to communicate effectively with DCS workers made it difficult for DCS to obtain clear and convincing evidence that the conditions that led to Jimmy's removal still persist." *Id.* We conclude that the record in this case does not contain clear and convincing evidence that Mother's substance abuse problems persisted at the time of trial.

Despite our conclusion regarding the lack of proof as to Mother's drug abuse by the time of trial, we believe there is clear and convincing evidence that the other "conditions that led to the child[ren's] removal or other conditions that in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect and that, therefore, prevent the child[ren's] safe return to the care of the parent or parents or the guardian or guardians, still persist." Tenn. Code Ann. § 36-1-113(g)(3)(A). Mother continued to have criminal problems, and she was arrested in September 2016 on charges of theft and criminal trespass. She and Father did not have stable housing at the time of trial. Mother conceded at trial that she was not ready to have the children return to her care.

---

[8] Although *In re Jimmy B.*, 2016 WL 2859180, at *7, refers to "the time termination proceedings were initiated," courts generally consider whether these conditions persist at the time of trial. *See In re Lillian D.*, No. E2016-00111-COA-R3-PT, 2016 WL 4505691, at *12-13 (Tenn. Ct. App. Aug. 26, 2016); *In re M.B.R.*, No. E2015-01906-COA-R3-PT, 2016 WL 3568183, at *6 (Tenn. Ct. App. June 23, 2016).

With respect to Father,[9] we conclude that the Department presented clear and convincing evidence that the conditions that necessitated removal "or other conditions that in all reasonable probability would cause the child[ren] to be subjected to further abuse or neglect and that, therefore, prevent the child[ren's] safe return to the care of the parent or parents or the guardian or guardians" persisted. Tenn. Code Ann. § 36-1-113(g)(3)(A). As with Mother, the Department could not prove Father's continuing drug abuse by the time of trial. Nevertheless, other conditions, including housing instability, lack of cooperation with the Department, and outstanding criminal issues, prevented the safe return of the children.

As detailed in the above discussion of substantial noncompliance, Mother and Father often did not cooperate with the Department's efforts to help them. The trial court found that there was "little chance that those conditions will be remedied soon so that the children can be returned safely to the home," and that "[c]ontinuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3)(B), (C). The evidence does not preponderate against these findings. We conclude that clear and convincing evidence supports the trial court's termination of Mother's and Father's parental rights on the ground of persistence of conditions.

5. Best interest

Having found clear and convincing evidence exists for at least one ground to terminate the parental rights of Mother and Father, we next consider whether the trial court properly determined that termination of each parent's rights is in the children's best interest. *See* Tenn. Code Ann. § 36-1-113(c)(2); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003) (noting that the trial court is only required to find one statutory ground for terminating a parent's rights). In reviewing the trial court's best interest determination, we are mindful that, "Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests." *In re Carrington H.*, 483 S.W.3d at 535 (citing *In re Kaliyah S.*, 455 S.W.3d at 555).

The factors a trial court is to consider in determining whether terminating a parent's rights to his or her children is in the children's best interest are set forth in Tenn. Code Ann. § 36-1-113(i) and include the following:

---

[9] Although Father mentions persistence of conditions at the end of the section of his brief on substantial noncompliance, he does not include an argument on persistence of conditions. We will, nevertheless, consider the merits of this ground as to Father.

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The best interest analysis "does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s nine factors"; rather, the relevance and weight accorded to each factor depends upon the facts of each case. *In re Audrey S.,* 182 S.W.3d at 878. Moreover, the list of factors in Tenn. Code Ann. § 36-1-113(i) is not exhaustive, and the court may consider any other relevant factors. *In re M.A.R.,* 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005); *White v. Moody,* 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004).

The trial court made the following findings regarding the best interest of the children in this case:

A. It is in the children's best interests for termination to be granted, because the parents have not made changes in their conduct or circumstances that would make it safe for the children to go home.

- 19 -

B. It is in the children's best interests for termination to be granted, because the parents have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.

C. It is in the children's best interests for termination to be granted, because the parents have not maintained regular and appropriate visitation with the children.

D. It is in the children's best interests for termination to be granted, because the parents have abused and neglected the children.

E. It is in the children's best interests for termination to be granted, because there is crime in the parents' home.

F. It is in the children's best interests for termination to be granted, because the parents abuse drugs or alcohol, rendering them consistently unable to care for the children in a safe and stable manner.

G. It is in the children's best interests for termination to be granted, because the parents' mental or emotional state would be detrimental to the children and would prevent them from effectively parenting the children.

H. It is in the children's best interests for termination to be granted, because the parents have not paid child support consistently.

I. It is in the children's best interests for termination to be granted, because the parents have shown little or no interest in the welfare of the children.

J. It is in the children's best interests for termination to be granted, because the children have established a strong bond with their foster parents, who wish to adopt them.

Mother asserts that the Department failed to make reasonable efforts to help her reunify with her children. In our discussion regarding the ground of abandonment for failure to provide a suitable home, we addressed the reasonableness of the Department's efforts during the four months after the removal of the children from the parents' home. The record contains affidavits of reasonable efforts detailing the Department's later efforts to assist Mother, including arranging visits with her children, drug screens, in-home services, revised permanency plans, and information and referrals to inpatient services after the in-home service provider refused to continue working with Mother.[10] Mother does not argue that she had trouble finding an inpatient drug and alcohol facility, yet she did not begin inpatient treatment until April 2016, months after the filing of the termination petition. Father emphasizes his efforts to stay in touch with his children by

---

[10] According to Mr. Fannin's affidavit of reasonable efforts dated March 24, 2016, the IOP in-home worker reported that Mother stole her laptop and that Mother "sent unintentional text messages that seemed to be arranging a drug deal."

calling while he was living in Louisiana and by visiting when he was in Tennessee. That one factor alone, however, is not determinative.

Considering the evidence as a whole, we conclude that there is clear and convincing evidence to support the trial court's determination that termination of Mother's and Father's parental rights is in the best interests of the children.

CONCLUSION

The judgment of the trial court is reversed with respect to the ground of abandonment by failure to visit during the four months prior to the filing of the petition as to Father. In all other respects, we affirm the judgment of the trial court that Mother's and Father's parental rights should be terminated. This matter is remanded with costs of appeal assessed half to Mother and half to Father, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE